UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY BURKE,
     Plaintiff,

     v.                                    CIVIL ACTION NO.
                                          17-11867-IT

ALTISOURCE SOLUTIONS, INC.,
OCWEN LOAN SERVICING LLC, and
HSBC BANK, USA,
     Defendants.

**REPORT AND RECOMMENDATION RE:
MOTIONS TO DISMISS VERIFIED COMPLAINT
(DOCKET ENTRY ## 7, 32)**

**June 7, 2018**

**BOWLER, U.S.M.J.**

This real estate dispute arises out of an attempted purchase of residential property in Brewster, Massachusetts through an online auction. After plaintiff Timothy Burke ("plaintiff") entered into a purchase and sale agreement ("the P&S") with defendant Ocwen Loan Servicing LLC ("Ocwen"), the seller, the closing did not take place. Ocwen and defendant Altisource Solutions, Inc. ("ASI"), which conducted the online bidding, move to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"). (Docket Entry # 7). Defendant HSBC Bank, USA ("HSBC"), which purchased the property at foreclosure in June 2016, also seeks to dismiss the complaint. (Docket Entry # 32). Plaintiff opposes both motions. (Docket Entry ## 15, 37). After

conducting a hearing on April 25, 2018, this court took the motions (Docket Entry ## 7, 32) under advisement.

The verified complaint sets out claims against "the Seller," which it defines as Ocwen, ASI, and HSBC, for:  breach of contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); specific performance (Count III); and declaratory relief (Count IV).  Counts V and VI allege violations of Massachusetts General Laws chapter 93A ("chapter 93A"), section nine, against Ocwen (Count V) and ASI (Count VI). (Docket Entry # 46).

<u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face" even if actual proof of the facts is improbable.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556, 570 (2007); <u>Miller v. Town of Wenham Massachusetts</u>, 833 F.3d 46, 51 (1st Cir. 2016).  The "standard is 'not akin to a "probability requirement," but it'" requires "'more than a sheer possibility that a defendant has acted unlawfully.'"  <u>Saldivar v. Racine</u>, 818 F.3d 14, 18 (1st Cir. 2016); <u>Feliciano-Hernàndez v. Pereira-Castillo</u>, 663 F.3d 527, 533 (1st Cir. 2011).  If the facts in the complaint "are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture,'" dismissal is appropriate.  <u>In re Montreal, Maine & Atl. Ry.,</u>

2

Ltd., 888 F.3d 1, 6 (1st Cir. 2018).  "[A]ll reasonable
inferences" are drawn "in the pleader's favor."  Sanders v.
Phoenix Ins. Co., 843 F.3d 37, 42 (1st Cir. 2016).

The complaint includes 74 pages of attached exhibits.
"Exhibits attached to the complaint are properly considered part
of the pleading 'for all purposes,' including Rule 12(b)(6)."
Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315,
321 (1st Cir. 2008).  It is also appropriate to consider the
"'implications from documents attached to or fairly incorporated
into the complaint.'"  Barchock v. CVS Health Corp., 886 F.3d 43,
48 (1st Cir. 2018).  Well-pleaded facts in a complaint must be
"non-conclusory" and "non-speculative."  Schatz v. Republican
State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012); accord
Saldivar v. Racine, 818 F.3d at 18 ("conclusory legal
allegations" are not credited).  The conclusory statement in the
complaint that "The Buyer complied with all terms of the P&S"
(Docket Entry # 46, ¶ 9) is therefore not considered.  Setting
aside "the complaint's conclusory averments," In re Curan, 855
F.3d 19, 25 (1st Cir. 2017), the non-conclusory, non-speculative
facts in the complaint and attached exhibits are as follows.

## FACTUAL BACKGROUND

In June 2016, HSBC acquired property located at 23 Essex Way
in Brewster ("the property") through a foreclosure.  Ocwen
executed a foreclosure deed for the property as an "attorney in

fact." (Docket Entry # 46, ¶ 5).[1]  The property includes a single family residence.

In or around January 2017, Ocwen listed the property for sale on HUBZU, "a subsidiary of ASI." (Docket Entry # 46, ¶ 6). Ocwen, ASI, and/or HSBC also listed the property for sale on Zillow.[2] (Docket Entry # 46, ¶ 7).  The Zillow listing describes the property as including a three-bedroom residence with central air conditioning and, like the HUBZU listing, pictures the front side of a roof over the structure.  (Docket Entry # 46, pp. 28–29, 32–34).[3]  Both listings denote the residence as occupied and state, "NO VIEWINGS of this property.  Please DO NOT DISTURB the occupant.  'As is' cash only sale with no contingencies or inspections . . . Live bidding is ACTIVE for this property," and the property is being "sold in 'as is' condition" with no warranties.  (Docket Entry # 46, pp. 28–29, 32–34) (Docket Entry # 46, ¶¶ 7–8).

Plaintiff was the successful bidder and entered into the

---

[1]  The parties jointly filed a duplicate of the original complaint to include more legible copies of certain documents. For simplicity, this court cites only the legible complaint as opposed to the previously-filed complaint.  Both are identical in substance.

[2]  The complaint defines "Seller" as Ocwen, ASI, inclusive of HUBZU, and HSBC.  Thereafter, it states that, "Seller listed the property with Zillow."  (Docket Entry # 46, ¶¶ 6-7).

[3]  Page numbers refer to the page number as docketed rather than the page number of the actual document.

P&S dated January 27, 2017.  With an effective date of February 3, 2017, the P&S includes provisions regarding:  the occupancy of the property; a waiver of specific performance as a remedy; an absence of representations regarding the septic system, the roof, and the air conditioning; a return of the deposit as the sole remedy in the event the seller defaults or commits a material breach; the existence of mold; and the buyer's responsibility to remediate mold.  (Docket Entry # 46, pp. 38, 41-62).

Under the P&S, plaintiff agreed to pay a purchase price of $215,000, additional costs in the amount of $9,974, and a deposit credited at closing in the amount of $6,450.  (Docket Entry # 46, ¶ 9) (Docket Entry # 46, pp. 38, 43-44, ¶¶ 2.11-2.14, 4.1.1, 4.1.2, 5.1).  The agreement provides that, "Subject to compliance with the terms and conditions of this Agreement, and subject to applicable law, Seller shall sell to Buyer and Buyer shall purchase from Seller the Property."  (Docket Entry # 46, p. 46, ¶ 3).  Plaintiff transmitted the deposit to Ocwen's closing agent, Elite Title & Closing Services, LLC ("Elite"), which "accepted the deposit . . . as an Escrow Agent."  (Docket Entry # 46, ¶¶ 10-11) (Docket Entry # 46, p. 43, ¶¶ 2.1, 2.3).  Subject to a few exceptions, the deposit was non-refundable.  (Docket Entry # 46, p. 44, ¶ 5.2) (Docket Entry # 46, p. 53, ¶ 12.3).  Plaintiff waived an inspection contingency.  (Docket Entry # 46, p. 43, ¶ 2.19).

In bold and capitalized letters, section 13.2 of the P&S emphasizes that the "PROPERTY IS SOLD 'AS IS, WHERE IS'" with "NO REPRESENTATIONS OR WARRANTIES." (Docket Entry # 46, p. 54, ¶ 13.2) (bolding omitted).  The section further provides that the "SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO ANY OF THE ABOVE," a category that includes the septic system,[4] the air conditioning, and the roof.  (Docket Entry # 46, p. 54, ¶ 13.2). Section 13.2 also states that the "SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO . . . THE CONDITION OF THE PROPERTY" or "THE PROPERTY'S SYSTEMS." (Docket Entry # 46, p. 54, ¶ 13.2).  As stated in the immediately preceding section, plaintiff acknowledged that the seller, Ocwen, acquired the property "pursuant to a foreclosure" or "similar action" and therefore "has not made any disclosures regarding the property" and is "not familiar with the condition of the property," except as "disclosed in any inspection reports" obtained by the seller which "should not be relied upon by buyer . . .." (Docket Entry # 46, p. 54, ¶ 13.1) (capitalization omitted).

_____

[4] Section 13.2 refers to "septic," an adjective, without adding the noun it modifies, i.e., system.  The paragraph elsewhere refers to "the property's systems" in general.  Because the import of the language disavows any warranty or representation for a septic system, the grammatical error of listing "septic" without an accompanying noun is immaterial.  The paragraph unambiguously prohibits representations and warranties by the seller regarding the septic system.  For clarity, this court refers to the "septic system" as opposed to the unadorned "septic."

The P&S set a closing date of February 20, 2017 and the parties "agreed that time is of the essence." (Docket Entry # 46, p. 43, ¶ 2.21) (Docket Entry # 46, p. 48, ¶¶ 9, 9.1) (capitalization omitted). The agreement afforded Ocwen, as the seller (Docket Entry # 46, p. 43, ¶ 2.1) and in its "sole discretion," a unilateral right to extend the closing date if it was "unable to close" by "the original Closing Date" of February 20, 2017. (Docket Entry # 46, p. 49, ¶ 9.5.1). "Any further extensions must be agreed to in writing by both Buyer and Seller." (Docket Entry # 46, p. 49, ¶ 9.5.1).

Separately, section 12.3 of the P&S gave Ocwen the ability to cancel the agreement if it was "unable to perform" or the property was "no longer available for sale for any reason," provided Ocwen gave plaintiff written notice. (Docket Entry # 46, p. 53, ¶ 12.3). In the event Ocwen exercised this right, plaintiff was "entitled to the return of the Deposit" as his "sole and exclusive remedy." (Docket Entry # 46, p. 53, ¶ 12.3). In the event of a "default or material breach" by Ocwen, the P&S likewise limited plaintiff's recovery to a return of the deposit. (Docket Entry # 46, p. 53, ¶ 12.4). Plaintiff waived the right to maintain an action for specific performance and agreed to the return of the deposit as adequate and fair compensation.[5]

--------

[5] The relevant language reads as follows:

As a material part of the consideration to be received by

(Docket Entry # 46, p. 53, ¶ 12.4).  Plaintiff also agreed that Ocwen was not liable "for any special, consequential or punitive damages . . . in contract . . . arising from or related to this agreement or a breach of this agreement."  (Docket Entry # 46, p. 53, ¶ 12.5) (capitalization omitted).  Moreover, "In the event [of] a legal proceeding," the P&S dictated an award of attorneys' fees and costs to the prevailing party.  (Docket Entry # 46, p. 60, ¶ 16.15).

Prior to the closing, the P&S required Ocwen and plaintiff to deliver "[a]n executed Settlement Statement" to the other party.  (Docket Entry # 46, pp. 49-50, ¶¶ 9.8.1, 9.8.2).  On February 14, 2017, "the Seller requested that its counsel prepare the HUD-1 (Settlement Statement) for review."  (Docket Entry # 46, ¶ 13).  Specifically, on February 14, 2017, Ramya A. Shetty, a closing coordinator at ASI, emailed a legal assistant at Elite asking, "Please advise us on HUD for seller's review."  (Docket Entry # 46, pp. 67, 83).  Ocwen's "counsel never prepared the

---

Seller under this Agreement, *Buyer waives all rights to file and maintain an action against Seller for specific performance and to record a lis pendens* against the Property if a dispute arises concerning this Agreement.  Buyer agrees that the Property is not unique and that in the event of Seller's default or material breach of the Agreement, Buyer can be adequately and fairly compensated solely by receiving a return of the Deposit . . . In no event shall Buyer have the right to seek or obtain specific enforcement of this Agreement.

(Docket Entry # 46, p. 53, ¶ 12.4) (emphasis added).

HUD-1" settlement statement for Ocwen or plaintiff. (Docket Entry # 46, ¶ 23) (Docket Entry # 46, p. 50, ¶¶ 9.8.1, 9.8.2). As stated in the P&S, the failure to perform this condition precedent to closing "shall not, in and of itself, relieve any Party of its obligations set forth elsewhere in this Agreement." (Docket Entry # 46, p. 49, ¶ 9.6).

In February, plaintiff and Elite discussed "the vacancy of the Property." (Docket Entry # 46, ¶ 12). The P&S denotes the property as "[o]ccupied" at the time of the listing. (Docket Entry # 46, p. 43, ¶ 2.22). In a February 14, 2017 email to plaintiff, Elite stated that the "property is vacant." (Docket Entry # 46, p. 67). On February 15, 2017, plaintiff forwarded the town's requirements for securing the final water bill to Elite. (Docket Entry # 46, ¶ 14) (Docket Entry # 46, p. 70). By email, he acknowledged his responsibility to obtain the final water bill. (Docket Entry # 46, p. 72). In a February 16, 2017 email regarding the final water bill, plaintiff informed Elite that the town needed to access the property. (Docket Entry # 46, p. 69) (Docket Entry # 46, ¶ 22).

During this time period, the parties agreed to a February 21, 2017 inspection. (Docket Entry # 46, ¶ 15) (Docket Entry # 46, p. 75). A February 21, 2017 email late in the afternoon from Elite asked plaintiff if he had gone to the property and states, "we are waiting on final bills in order to schedule the closing."

(Docket Entry # 46, p. 64).  During the inspection to the property on or about February 21, 2017, plaintiff discovered the property did not have central air conditioning.  (Docket Entry # 46, ¶ 16).  In a February 22, 2017 email plaintiff sent to Elite and a number of other individuals, plaintiff complained there was no central air conditioning and the property was "infested with black mold."  (Docket Entry # 46, p. 64).  As stated in the email, plaintiff deemed the failure to provide a warning about the mold "unacceptable."  (Docket Entry # 46, p. 64).  The email notes that Ocwen had the property winterized and therefore "knew of the problem" but did not inform him about the condition.  (Docket Entry # 46, p. 64) (Docket Entry # 46, ¶ 21).  Section 13.3.6 of the P&S states that, "Seller further advises buyer that as a consequence of possible water damage and/or excessive moisture, the Property may be or has been irrevocably contaminated with mildew, mold, and/or other microscopic organisms" and that "exposure to certain species of mold may pose serious health risks . . .."  (Docket Entry # 46, p. 55, ¶ 13.3.6).  Plaintiff experienced respiratory issues for two days after the inspection.  (Docket Entry # 46, ¶ 21).

As indicated, the closing did not take place on February 20, 2017.  The P&S provides for an automatic extension of the "original Closing Date" for 30 days at Ocwen's "sole discretion" if Ocwen is "unable to close the transaction."  (Docket Entry #

46, p. 49, ¶ 9.5.1).  The day after plaintiff's February 22, 2017 email regarding the black mold and lack of air conditioning, plaintiff sent Ocwen a chapter 93A demand letter alleging fraud and deceit on the part of Ocwen for engaging in half-truths and material misrepresentations about the black mold, the lack of air conditioning, and the failure to inspect the septic system within six months of the June 2016 foreclosure sale.  (Docket Entry # 46, pp. 15-22).  Seeking $50,000, the letter advised Ocwen that plaintiff would file a lawsuit seeking damages absent a reasonable settlement offer within 30 days.  (Docket Entry # 46, p. 22).

In an email dated April 11, 2017, the closing coordinator at ASI informed plaintiff and a number of other individuals "that the Seller ha[d] exercised its automatic and unilateral right to extend the Closing Date" under section 9.5.1 of the P&S to April 25, 2017.  (Docket Entry # 46, p. 83) (Docket Entry # 46, ¶ 23). By email dated April 19, 2017, Ocwen "voided and canceled the P&S."  (Docket Entry # 46, ¶ 24) (Docket Entry # 46, p. 85).

By letter dated June 12, 2017, Ocwen's counsel wrote to plaintiff.  The letter states that, as set forth in an "enclosed Seller Termination of Purchase and Sale Agreement," the agreement "has been terminated as the closing was unable to occur by the Closing Date" and, "pursuant to Section 12.3," the deposit held by Elite "will be returned to you . . .."  (Docket Entry # 46, ¶

11

25) (Docket Entry # 46, p. 87).  The attached Seller Termination

of Purchase and Sale Agreement dated April 19, 2017 with an

executed signature by the "Seller" dated April 18, 2017 instructs

that the deposit of $6,450 "shall be" returned to plaintiff.

(Docket Entry # 46, ¶ 25) (Docket Entry # 46, p. 88).  It further

states that the closing was "unable to occur" by the closing date.

(Docket Entry # 46, ¶ 25) (Docket Entry # 46, p. 88).

DISCUSSION

I.  <u>Breach of Contract (Count I)</u>

Ocwen, ASI, and HSBC ("defendants") initially move to

dismiss the contract claim against ASI and HSBC because they are

not parties to the P&S.  (Docket Entry ## 8, 32).  They also

maintain that the indemnification provision bars all of the

claims or counts in the complaint, including the breach of

contract count.  (Docket Entry ## 8, 32).  As to Ocwen, they

submit that:  (1) plaintiff was not ready, willing, and able to

perform the contract; (2) Ocwen did not breach the P&S; and (3)

Ocwen canceled the P&S under section 12.3 and returned the

deposit such that plaintiff did not suffer any damages.  (Docket

Entry ## 8, 32).  Plaintiff submits that "the Sellers," which he

defines as Ocwen and ASI, are the parties that breached the P&S

because they refused to comply with environmental laws in the

following manner:  (1) they did not undertake to complete an

inspection of the septic system as required under chapter 310 of

Massachusetts Code of Regulations, section 15.301 ("regulation

12

15.301"), and a Brewster "Real Estate Transfer Regulation"
(Docket Entry # 46, pp. 77-81); and (2) they "acted to avoid the
entry" of town employees seeking to secure a final water meter
reading.[6]  (Docket Entry ## 15, 37).  Plaintiff argues that these
breaches were material which thereby excused plaintiff from
further performance.

A breach of contract under Massachusetts law "requires the
plaintiff to show that (1) a valid contract between the parties
existed, (2) the plaintiff was ready, willing, and able to
perform, (3) the defendant was in breach of the contract, and (4)
the plaintiff sustained damages as a result." Bose Corp. v.
Ejaz, 732 F.3d 17, 21 (1st Cir. 2013).  In short, the plaintiff
must show that a valid "'contract existed, the defendant breached
the terms of the contract, and the plaintiff sustained damages as
a result of the breach.'" Young v. Wells Fargo Bank, N.A., 717
F.3d 224, 232 (1st Cir. 2013) (internal brackets omitted).

---

[6]   Except for the above two violations, plaintiff does not
identify any other specific "law[] protecting the environment"
that Ocwen allegedly violated in opposition to the motion to
dismiss (Docket Entry ## 15, 37). See Vallejo v.
Santini-Padilla, 607 F.3d 1, 7, n.4 (1st Cir. 2010)
("[p]laintiffs have not cited a single authority in support of
their assertion that their failure to timely oppose the motion to
dismiss did not constitute waiver" and noting that "[p]laintiffs
did not properly raise their arguments below"); see also Galvin
v. U.S. Bank, N.A., 852 F.3d 146, 160 (1st Cir. 2017)
("allegation that the defendants failed to comply with
'applicable law' does not specify the law with which the
defendants allegedly failed to comply or how they failed to
comply with it" and "is too vague and conclusory to state a claim
for which relief can be granted").

Regulation 15.301 requires inspection of a septic system "at or within two years prior to the time of transfer of title . . .."[7]  310 Mass. Code Regs. 15.301.  The owner or operator of the septic system is "responsible for the inspection and maintenance of, and any necessary upgrades to, the system."  310 Mass. Code Regs. 15.300(4).  "A copy of the complete inspection report shall be submitted to the buyer . . .."  310 Mass. Code Regs. 15.301. An owner's failure "to have the system inspected" constitutes a violation of 310 Mass. Code Regs. 15.000.  310 Mass. Code Regs. 15.301(11).  Subject to certain exceptions, the Brewster "Real Estate Transfer Regulation" requires the owner to have an inspection of the septic system no less than 30 days before a transfer of property.  (Docket Entry # 46, pp. 77, 80).  In the event an inspection uncovers a failed system, the Brewster Board of Health or the Brewster Board of Health Director may require a repair or replacement of the system and may institute an enforcement action to compel compliance with any enforcement order.  (Docket Entry # 46, pp. 77-81).

Examining whether Ocwen breached the terms of the P&S in the manner alleged by plaintiff and sustained damages as a result, plaintiff argues that Ocwen breached the P&S by refusing to comply with the aforementioned laws protecting the environment.

---

[7]  If weather prevents an inspection, the regulation allows an inspection up to six months after the transfer.  310 Mass. Code Regs. 15.301.

14

(Docket Entry ## 15, 37, pp. 3-4).  First, plaintiff does not identify and the P&S does not include an express provision requiring Ocwen to comply with environmental laws.[8]  Cf. Steadfast Ins. Co. v. Forsyth Intern., Inc., Civil Action No. 13-12169-GAO, 2014 WL 4966050, at *3 (D. Mass. Sept. 30, 2014) (contract expressly required tenant to "'comply with all laws, statutes, ordinances, rules and regulations of any local, state or federal governmental authority having jurisdiction concerning environmental'" matters); Tate & Lyle Ingredients Americas, Inc. v. Transport Distrib., LLC, 746 F. Supp. 2d 189, 197 (D. Me. 2010) (defendant breached contractual provision requiring it to "'observe, abide by and comply with all applicable laws, rules, ordinances, and regulations of federal, state, municipal and other governmental agencies in performing its obligations hereunder'"); Berman Devalerio Pease Tabacco Burt & Pucillo v. Rubinstein, Civil Action No. 07-12127-PBS, 2008 WL 7593022, at *12 (D. Mass. Feb. 28, 2008) (plaintiff breached agreement by not opening office in "attempt to evade New York tax law, thereby breaching the Agreement's compliance with law provision").

---

[8]    By not developing an argument, plaintiff waived a breach of contract based on Ocwen's violation of the "subject to applicable law" language in section three of the P&S as well as the obligation to deliver "[f]orms or disclosures required by state law" at the closing under section 9.8.1.  See Vallejo v. Santini-Padilla, 607 F.3d at 7, n.4; accord Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010); see also Galvin v. U.S. Bank, N.A., 852 F.3d at 160.

Indeed, the P&S expressly required plaintiff to obtain any septic system certification and placed the responsibility for undertaking any repairs on plaintiff. (Docket Entry # 46, p. 56, ¶ 13.3.8.1). The P&S did not include a contingency requiring a satisfactory Title V septic system inspection. Under the P&S, Ocwen made no representation or warranty regarding the "septic" system or the "environmental condition" of the property. (Docket Entry # 46, p. 54, ¶ 13.2) (capitalization omitted). Consequently, as presented by plaintiff, there was no breach of an obligation to comply with laws intended to protect the environment.

Second, even assuming the existence of a breach of the P&S by virtue of a failure to comply with regulation 15.301 or the Town of Brewster's regulation, plaintiff did not sustain any damages as a result of the breach. As correctly pointed out by defendants, Ocwen canceled the P&S under section 12.3 and agreed to return the deposit to plaintiff. (Docket Entry # 46, pp. 87-88). Section 12.3 allowed Ocwen to cancel the P&S if it was "unable to perform" and, "[i]n such an event, Buyer shall be entitled to the return of the Deposit . . . as Buyer's sole and exclusive remedy at law and/or equity." (Docket Entry # 46, p. 53, ¶ 12.3). Because Ocwen terminated the transaction in accordance with section 12.3, the closing did not occur and plaintiff did not experience any damages due to Ocwen's failure

16

to undertake an inspection of the septic system.

Finally, addressing plaintiff's material breach argument, it is true that a "'material breach by one party excuses the other party from further performance under the contract.'" Teragram Corporation v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006) (citations omitted). The P&S, however, did not include a provision requiring Ocwen to comply with environmental laws. Hence, any failure to undertake a septic system inspection was not a breach, let alone a material breach, of the P&S.[9]

Turning to the other purported violation or refusal to comply with environmental laws, plaintiff contends that Ocwen "acted to avoid the entry of" town employees to secure a final water meter reading. (Docket Entry # 46, p. 8). As previously noted, plaintiff acknowledged he was responsible to obtain the final water bill and the town required access to obtain a water meter reading. (Docket Entry # 46, pp. 69, 72). Ocwen, however, allowed plaintiff to inspect the property on February 21 or 22, 2017 even though plaintiff waived an inspection. It therefore provided an opportunity for town employees and plaintiff to obtain a final water meter reading. Defendants' argument that Ocwen did not breach the P&S is therefore well taken.

---

[9]   Ocwen's noncompliance might subject it to an enforcement action by the Brewster Board of Health if Ocwen transferred the property without undertaking a timely inspection. Any noncompliance, however, was not a breach of the terms of the P&S and plaintiff did not suffer any damages as a result.

17

In the alternative and contrary to plaintiff's position, preventing town employees from obtaining a final water meter reading is not a material breach of the P&S.  "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract.'"  Lease-It, Inc. v. Massachusetts Port Authority, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992) (quoting Bucholz v. Green Brothers Co., 172 N.E. 101, 102 (Mass. 1930)) (internal brackets omitted); accord Teragram Corporation v. Marketwatch.com, Inc., 444 F.3d at 11 (also quoting Bucholz, 172 N.E. at 102); see also Aerostatic Engineering Corp. v. Szczawinski, 294 N.E.2d 521, 523 (Mass. App. Ct. 1973) ("a substantial breach going to the root of the contract" entitles non-breaching party to terminate performance). The water bill was a small fraction of the total purchase price. The P&S obligated plaintiff to indemnify Ocwen for claims regarding the proration of municipal water charges "due and owed" by Ocwen.  (Docket Entry # 46, pp. 50, 57, ¶¶ 101, 14(d)).  Thus, although more appropriately analyzed as a breach of the implied duty to act in good faith in the *performance* of the contract, any conduct by Ocwen to avoid or prevent entry of town employees to read the water meter is not a material breach.  Finally, for reasons stated above, plaintiff did not sustain any damages as a result of any such breach.

To the extent plaintiff asserts a breach of contract claim

based on Ocwen's purported misrepresentations of the condition of the property with respect to the existence of air conditioning, the rear side of the roof, the septic system, and the black mold, there was no breach because, as defendants repeatedly argue, the transaction was an "as is" sale without an inspection contingency.[10]  In selling the property "as is," Ocwen made no representations or warranties regarding the condition of the property, including the "septic" system, the "habitability," the "roof," and the "air conditioning."  (Docket Entry # 46, p. 54, ¶ 13.2).  During oral argument, defendants aptly summarized the terms of section 13.3.6, which instruct plaintiff to contact a professional if he is concerned about mold.  The section further advises plaintiff that, as a consequence of possible water damage, "the Property may be or has been irrevocably contaminated with" mold.[11]  (Docket Entry # 46, p. 55, ¶ 13.3.6).  An

---

[10]  It is not clear whether plaintiff raises a breach of contract or breach of the implied covenant claim regarding the air conditioning, the roof, the septic system, and the black mold.  Defendants argue that the as-is sale without conditions, warranties, or an inspection contingency serves to bar *each* count in the complaint.  Accordingly, out of an abundance of caution, this court addresses the misrepresentations regarding the condition with respect to the contract claims.

[11]  This language eviscerates the existence of a misrepresentation or half-truth regarding the existence of black mold.  "In Massachusetts, sellers in an arm's length transaction are not liable for 'failing to disclose every latent defect known to them which reduces materially the value of the property and of which the buyer is ignorant.'"  RAM Mgt. Co., LLC v. First Highland Mgt. and Dev. Corp., Civil Action No. 12-12244-GAO, 2013 WL 5442368, at *3 (D. Mass. Sept. 30, 2013) (quoting Nei v.

integration clause (Docket Entry # 46, p. 59, ¶ 16.3), cited by
defendants at the hearing, forecloses a breach based on the
statement in the Zillow listing regarding air conditioning.
Finally, as argued by defendants, plaintiff did not suffer
damages as a result of any breach vis-à-vis the purported
misrepresentations of the air conditioning, the roof, the septic
system, and the black mold.  As previously explained, Ocwen
canceled the P&S under section 12.3 and ordered the return of
plaintiff's deposit.

    With respect to ASI and HSBC, defendants submit they are not
parties to the P&S.  Plaintiff does not address this contention
thereby waiving any argument based on agency.[12]  See Vallejo, 607
F.3d at 7, n.4; Coons, 620 F.3d at 44.  The argument is also well
taken.  See Chanthavong v. John Doe Corp., 2012 WL 6840496, *3
(D.R.I. Nov. 19, 2012); Glover v. Udren, 2010 WL 5829248, at *3

---

Burley, 446 N.E.2d 674, 676 (Mass. 1983)).  "Mere non-disclosure
during negotiations is not actionable."  Id.  When a party
"'discloses partial information that may be misleading,'" the
party "'has a duty to reveal all the material facts he knows to
avoid deceiving the other party.'"  Id. (quoting V.S.H. Realty,
Inc. v. Texaco, Inc., 757 F.2d 411, 414 (1st Cir. 1985)).  Here,
Ocwen's disclosure that the property "may be or has been
irrevocably contaminated with mold" (Docket Entry # 46, p. 55, ¶
13.3.6) was neither misleading nor a partial disclosure that
created a duty to reveal additional, material facts.  In short,
plaintiff is mistaken that Ocwen did not disclose the presence of
mold at the property and/or that Ocwen made a partial disclosure
sufficient to invoke a duty to speak.  See id. (quoting and
paraphrasing Kannavos v. Annino, 247 N.E.2d 708, 712 (Mass.
1969)).

    [12]  See footnotes six and eight.

20

(W.D.Pa. Oct. 21, 2010).  The P&S states that the agreement "is made by and between Seller and Buyer, both as defined in Section 2." (Docket Entry # 46, p. 42).  Section two defines the "Seller" as Ocwen.  ASI is a former subsidiary of Ocwen (Docket Entry # 46, ¶ 6) as opposed to a successor or assignee within the meaning of section 16.13 of the P&S.  HSBC is also not a party to the agreement.

In sum, a Rule 12(b)(6) dismissal of the breach of contract claim is therefore appropriate.

II.   Covenant of Good Faith and Fair Dealing (Count II)

Defendants move to dismiss the implied covenant claim against ASI and HSBC because they are not parties to the P&S. (Docket Entry ## 8, 32).  As to Ocwen, they maintain that Ocwen did not breach the covenant and plaintiff did not sustain any damages.  (Docket Entry ## 8, 32).  Defendants further reason that the covenant does not create new rights and duties beyond those in the P&S.  (Docket Entry ## 8, 32).  In response, plaintiff relies on the existence of a material breach on the part of "the Sellers," i.e., Ocwen and ASI, which excuses plaintiff from further performance.  (Docket Entry ## 15, 37). He also contends that Ocwen and ASI did not comply with the aforementioned environmental laws and misrepresented the condition of the property as to the air conditioning, the roof,

the septic system, and the black mold.[13]

Massachusetts law implies a covenant of good faith and fair dealing into every contract.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  The covenant requires that the parties not "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000); see Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004).  As posited by defendants, "'the scope of the covenant is only as broad as the contract that governs the particular relationship.'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100 (quoting Chokel v. Genzyme Corporation, 867 N.E.2d 325, 329 (Mass. 2007)).  The covenant does not "'"create rights and duties not otherwise provided" for in the contract.'"  Id. (quoting Chokel v. Genzyme Corporation, 867 N.E.2d at 329).  Overall, the covenant "concerns the manner of performance" of the contract.  Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d at 964.  Thus, when performing the obligations of a contract, the parties must "'remain faithful to the intended and agreed expectations' of the contract."  Chokel v. Genzyme Corporation, 867 N.E.2d at 329.

For reasons stated in Roman numeral I, the P&S did not include a provision requiring Ocwen to comply with laws intended

---

[13]   See footnote nine.

to protect the environment.  Consequently, even if Ocwen acted to
avoid its responsibilities to comply with such laws by not
undertaking to complete an inspection of the septic system, the
P&S did not impose a contractual obligation to comply with laws
protecting the environment and, accordingly, Ocwen did not breach
the covenant.  See, e.g., Lafayette Place Associates v. Boston
Redevelopment Authority, 694 N.E.2d 820, 831 (Mass. 1998)
("[e]ven if the defendants' refusal to extend the deadline was
motivated by the possibility of evading the pricing formula in
the Tripartite Agreement, as LPA suggests, that refusal could not
constitute bad faith, because the BRA had no contractual duty to
grant the extension that LPA sought").  Moreover, because Ocwen
afforded plaintiff the opportunity to have town officials read
the water meter by allowing an inspection of the property on or
about February 21, 2017 once it was vacated, there is no
plausible basis that Ocwen violated the covenant in the manner
suggested by plaintiff.

As explained above, the P&S made no representation regarding
the absence of mold, a non-leaking or water-tight roof, the
septic system, or the air conditioning.  The integration clause
foreclosed any reliance or existence of a promise that the
property had air conditioning or a non-leaking roof based on the
Zillow and HUBZU listings.  Because the covenant is only as broad
as the underlying contract, see FAMM Steel, Inc. v. Sovereign

Bank, 571 F.3d at 100, neither Ocwen nor ASI violated the implied covenant of good faith and fair dealing with respect to the absence of mold, the purportedly deficient roof, the septic system, or the existence of air conditioning.

In the alternative and as previously discussed, defendants are correct that any breach did not cause plaintiff any damages. Finally, plaintiff does not address defendants' argument to dismiss Count II as to ASI and HSBC because they are not parties to the P&S.  Here again, the covenant is not broader and more encompassing than the terms of the underlying contract.  As explained previously, neither ASI nor HSBC are parties to the P&S and plaintiff waived any argument to the contrary.  Count II is therefore subject to dismissal.

III.  Specific Performance (Count III)

In seeking to dismiss the specific performance count, defendants argue that plaintiff waived his right to maintain an action for specific performance under the language of the P&S. (Docket Entry # 8, p. 6) (Docket Entry # 32).  Plaintiff asserts that Ocwen and ASI intentionally breached the P&S and their material breach excuses plaintiff from further performance. (Docket Entry ## 15, 37).  In addition to a number of other arguments, defendants also contend that ASI and HSBC are not parties to the P&S and plaintiff is therefore not entitled to specific performance against them.  (Docket Entry ## 8, 32).

24

Count III for specific performance incorporates the prior paragraphs in the complaint, namely, the paragraphs supporting the breach of contract and the breach of the implied covenant of good faith and fair dealing claims. (Docket Entry # 46, p. 10, ¶ 31). It seeks an order for "specific performance of the Purchase and Sale Agreement" in light of Ocwen's failure to convey the property and issuance of "a Lis Pendens on behalf of the Plaintiff." (Docket Entry # 46, p. 10). Because the breach of contract and the breach of the implied covenant claims are subject to dismissal, the specific performance claim also fails. See Cordoba v. Ricciardelli, Civil Action No. 01-3388, 2003 WL 831760, at *6 n.8 (Mass. Super. Mar. 6, 2003) (finding it unnecessary to address specific performance claim because court found in defendant's favor on breach of purchase and sale agreement and breach of implied covenant claims).

In the alternative, this court turns to defendants' argument that the language of the P&S bars an action for specific performance and to record a lis pendens against the property. Defendants submit that the language limits plaintiff to a return of the deposit as his "'sole and exclusive remedy.'" (Docket Entry # 8, p. 6).

Contracts "are interpreted according to their plain terms." Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013). "When the words of a contract are clear, they must be construed

in their usual and ordinary sense." <u>General Convention of New Jerusalem in the U.S. of America, Inc. v. MacKenzie</u>, 874 N.E.2d 1084, 1087 (Mass. 2007); <u>accord</u> <u>Balles v. Babcock Power Inc.</u>, 70 N.E.3d 905, 911 (Mass. 2017) (when language of "contract is clear, it alone determines the contract's meaning"); <u>Barclays Bank PLC v. Poynter</u>, 710 F.3d at 21.  "Contractual language is ambiguous when it 'can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" <u>Balles</u>, 70 N.E.3d at 911. "When contract language is unambiguous, it" is "construed according to its plain meaning." <u>Id.</u>  Finally, words are not taken in isolation but rather "within the context of the contract as a whole." <u>Barclays Bank PLC v. Poynter</u>, 710 F.3d at 21.

The relevant language in the P&S states that:

> If Seller is unable to perform as required by this Agreement for any reason, . . . then this Agreement may be cancelled upon Seller's written notice to Buyer.  In such an event, Buyer shall be entitled to the return of the Deposit . . . as Buyer's *sole and exclusive* remedy at law and/or equity. In no event shall Buyer have the right to seek or obtain *specific performance* or enforcement of this Agreement.

(Docket Entry # 46, p. 53, ¶ 12.3) (emphasis added).  The next paragraph reinforces plaintiff's waiver of specific performance as a remedy as well as his ability to record a lis pendens.  In pertinent part, it reads as follows:

> Buyer waives *all rights to file and maintain an action against Seller for specific performance and to record a lis pendens* against the Property if a dispute arises concerning this Agreement.  Buyer agrees that the Property is not

26

unique and that in the event of Seller's default or material breach of the Agreement, Buyer can be adequately and fairly compensated *solely* by receiving a return of the Deposit . . . In no event shall Buyer have the right to seek or obtain specific enforcement of this Agreement.

(Docket Entry # 46, p. 53, ¶ 12.4) (emphasis added).

The language is clear and unambiguous. Plaintiff's "sole" remedy was a return of the deposit in the event Ocwen materially breached the agreement or canceled the agreement because it was unable to perform. This court cannot overlook the language limiting plaintiff to the "sole and exclusive remedy" of a return of the deposit and rewrite the agreement. See Wells Real Estate Investment Trust II, Inc. v. Chardon/Hato Rey Partnership, S.E., 615 F.3d 45, 56 (1st Cir. 2010) (noting that language "unambiguously states that Wells' 'sole remedies and recourses' are 'limited' to the two enumerated courses of action" and refusing to ignore "references to 'sole' and 'limited'" by rewriting "Agreement to provide a third avenue of relief").

The only argument plaintiff raises to avoid a dismissal of the specific performance count is Ocwen's intentional and/or material breach of the P&S in the manner described in Roman numeral I. (Docket Entry ## 15, 37). For the same reasons set out in Roman numeral I, Ocwen's conduct did not constitute a material breach. Raising no other argument to avoid the plain language of sections 12.3 and 12.4, plaintiff cannot resort to the remedy of specific performance or the recording of a lis

27

pendens.  Count III is subject to a Rule 12(b)(6) dismissal.

IV.  <u>Declaratory Relief (Count IV)</u>

Count IV requests declaratory relief to excuse plaintiff from the above-noted waiver in section 12.4 of specific performance and the recording of a lis pendens.  (Docket Entry # 46, ¶¶ 34-38).  Count IV alleges that Ocwen's breach excuses plaintiff from these restrictions in section 12.4.  (Docket Entry # 46, ¶ 36).

Defendants maintain that the plain language of the waiver in section 12.4 warrants the dismissal of Count IV.  They submit, correctly, that this court cannot rewrite the terms of the parties' contract.  (Docket Entry ## 8, 32).  In opposing a dismissal, plaintiff again argues that Ocwen's intentional and/or material breach prevents Ocwen from relying on the language in section 12.4.  (Docket Entry ## 15, 37).

For reasons explained in Roman numeral III, the language in section 12.4 is clear and unambiguous.  As explained in Roman numeral I, Ocwen did not materially breach the P&S in the manner alleged by plaintiff.  Under the plain language of section 12.4, plaintiff waived his ability to seek specific performance or a recording of a lis pendens.  Plaintiff's single sentence allegation that "the provisions of the P&S are unenforceable as a matter of public policy" (Docket Entry # 15, p. 6) (Docket Entry # 37, p. 6) is not adequately developed as an argument and

therefore waived.  See Vallejo, 607 F.3d at 7, n.4; Coons, 620
F.3d at 44 ("district court was 'free to disregard' the state law
argument that was not developed in Coons's brief"); see also
Galvin v. U.S. Bank, N.A., 852 F.3d at 160.  Accordingly, the
declaratory relief count is subject to dismissal.

V.   Chapter 93A (Counts V and VI)

 Defendants move to dismiss the chapter 93A claims against
Ocwen and ASI because neither Ocwen nor ASI engaged in any unfair
or deceptive acts or practices.  They assert that a seller is not
liable for a nondisclosure where a buyer's inquiry does not
create a duty to speak and "'[t]here is no liability for failing
to disclose what a person does not know.'"  (Docket Entry # 8)
(quoting Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993)).
In the alternative, they maintain that plaintiff did not suffer
any damages or compensable loss even considering the two days of
respiratory issues plaintiff experienced after the inspection.
(Docket Entry # 8) (citing Hershenow v. Enterprise Rent-A-Car
Company of Boston, Inc., 840 N.E.2d 526, 535-36 (Mass. 2006), and
Rule v. Fort Dodge Animal Health, Inc., 604 F. Supp. 2d 288, 304
(D. Mass. 2009), aff'd, 607 F.3d 250 (1st Cir. 2010)) (Docket
Entry # 32).  In order to recover under chapter 93A, defendants
contend that plaintiff must show that Ocwen's or ASI's deceptive
conduct caused some form of compensable loss.  (Docket Entry # 8)
(citing Hershenow, 840 N.E.2d at 535-36, and Rule, 604 F. Supp.

2d at 304) (Docket Entry # 32).

Plaintiff responds that Ocwen and ASI violated chapter 93A because they knew about the black mold inasmuch as they winterized the property.  They also misrepresented the condition of the roof and never corrected the listing representing that the property had air conditioning, according to plaintiff.  Ocwen and ASI also purportedly engaged in a strategy to avoid compliance with the aforementioned environmental laws and deceptively listed the property as air conditioned.  (Docket Entry ## 15, 37).  With respect to damages, plaintiff only identifies "the appreciation which was available from the property."  (Docket Entry ## 15, 37).

Turning to the damages or injury argument, chapter 93A provides a "right of action to any person '*who has been injured* by another person's use or employment of any method, act or practice declared to be unlawful" under the statute.  <u>Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc.</u>, 840 N.E.2d at 532 (emphasis added); <u>Rule v. Fort Dodge Animal Health, Inc.</u>, 607 F.3d 250, 253 (1st Cir. 2010) ("[c]hapter 93A provides a cause of action for a plaintiff who 'has been injured' by 'unfair or deceptive acts or practices'") (quoting sections 9(1) and 2(a) with citations omitted).  The Massachusetts Supreme Judicial Court "has consistently recognized that, to warrant an award of damages under G.L. c. 93A, there must be a 'causal connection

between the seller's deception and the buyer's loss.'"
Hershenow, 840 N.E.2d at 532; see Rhodes v. AIG Dom. Claims,
Inc., 961 N.E.2d 1067, 1076 (Mass. 2012)("Hershenow reaffirms the
established principle that . . . plaintiff must prove
causation—that is, . . . that the defendant's unfair or deceptive
act caused an adverse consequence or loss").  After surveying
Massachusetts case law, the First Circuit in Rule concluded that,
"the most recent" Massachusetts Supreme Judicial Court cases
"appear to have returned to the notion that injury under chapter
93A means economic injury in the traditional sense."  Rule v.
Fort Dodge Animal Health, Inc., 607 F.3d at 255.

As to the asserted appreciation in the value of the
property, the injury component of chapter 93A applies to per se
violations such as those encompassed by 940 Mass. Code Regs.
3.16(3).  See Mulder v. Kohl's Dept. Stores, Inc., Civil Action
No. 15-11377-FDS, 2016 WL 393215, at *3-6 (D. Mass. Feb. 1,
2016), aff'd, 865 F.3d 17 (1st Cir. 2017).  The fact that there
is a violation of section two of chapter 93A, however, "does not
necessarily mean the consumer has suffered an injury or a loss
entitling [him] to at least nominal damages and attorney's fees;
instead, the violation of the legal right that has created the
unfair or deceptive act or practice must *cause* the consumer some
kind of separate, identifiable *harm arising from the violation
itself*."  Tyler v. Michaels Stores, Inc., 984 N.E.2d 737, 745

31

(Mass. 2013) (emphasis added).  The purported unfair or deceptive
act or practice of avoiding compliance with an inspection of the
septic system, see 940 Mass. Code Regs. 3.16(3), however, did not
plausibly cause plaintiff's loss of the appreciated value of the
property arising from that deception or act.  Ocwen canceled the
agreement because it was unable to close by the closing date in
accordance with section 12.3 of the P&S and returned the deposit
to plaintiff.[14]  Similarly, the failure to correct the Zillow
listing's description of the property as having central air
conditioning, assuming arguendo it constitutes an unfair or
deceptive act or practice, did not cause any harm or compensable
injury arising from that violation in the form of a loss of the
appreciation of the property inasmuch as plaintiff discovered the
lack of air conditioning on or about February 21, 2017.  The
deception, if any, regarding the roof, the air conditioning,
and/or the mold did not continue after plaintiff inspected the
property.  The remaining purportedly unfair or deceptive acts or
practices likewise did not cause damages or a compensable loss in
the form of "the appreciation which was available from the

---

[14]  The facts and reasonable inferences uniformly indicate
that Ocwen returned the deposit.  Because the complaint does not
affirmatively state that Ocwen or one of its agents returned the
deposit, however, and in the event plaintiff did not receive the
deposit, he may seek leave to amend the chapter 93A claim to
allege that he did not receive a return of the deposit and suffer
damages within 14 days of the date of this opinion.

property" (Docket Entry ## 15, 37).[15]

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[16] that the motions to dismiss (Docket Entry ## 7, 32) be **ALLOWED** absent a motion for leave to amend filed within 14 days.[17]

       /s/ Marianne B. Bowler
       **MARIANNE B. BOWLER**
       United States Magistrate Judge

---

[15] It is therefore not necessary to address defendants' alternative basis to dismiss the chapter 93A claim.

[16] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included. See Fed. R. Civ. P. 72(b). Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

[17] See footnote 14.